As I say, there are so many issues to try to get to the bottom of, and I'm going to keep this as organized as possible. Maybe we should go through them in some kind of lots of order. Out-of-state standing should be the opposite. There's no standing. We don't have much business. We can't conduct any business today. And then it seemed to me it would make sense to hit preemption for the same reason and then due process and the variations of that, the anonymity issue, and then the police fire was never decided by the district court, but we can touch on that if you want to. Let's introduce yourself. Yes, may it please the court. My name is Chris Kobach, representing the appellant, City of Hazelton. With the court's leave, what I'd like to do is spend 20 minutes first arguing these issues and then reserve 10 minutes for rebuttal. That's fine. Let me also just mention it because my guess is I don't normally pay certain attention to a lot of it, particularly in the case of this magnitude and the case in O'Hara, which is normally we only do that in cases of capital habeas appeals. But if anyone needs a break during the course of this, and it may well be that we'll beat you to it if we need a break and recess, if anyone needs a break, just counsel, just raise your hand and nod, and if I see it, hopefully I see it, we'll call a brief recess. Don't feel at all like you're interrupting proceedings or feel at all intimidated about doing that. Just let us know you need a break and you've got a break. Well, Your Honor, the appeal principally concerns Hazelton Ordinance. And so you did give your name, right? Yes, Chris Kobach. The appeal principally concerns two parts, the ordinance principally contains two parts, and that is, well, let me back up. The ordinance is Ordinance 2006-18 as amended by 2006-40. And when I say the ordinance or the IIRA, that's what I'll be referring to. And because the names are so similar, we've got IRCA, we've got IIRA, and IRRIRA, it may be helpful to refer to the federal – if we're talking about IRCA, let's call it the federal statute, and IRRIRA is the other federal statute, we won't confuse. But rather than saying – and I just did – rather than saying IRRIRA, why don't you say the Hazelton Ordinance? And IRRIRA would be the federal legislation, and IRRIRA could then – if I hear IRRIRA, I know you're not talking about IIRA, but you're talking about the federal legislation. All right, Your Honor. I will refer to it as the ordinance. The ordinance essentially has two halves, as you know. An employment half, which bars an employer from knowingly employing an unauthorized alien and imposes the consequence of a suspension of business license. And then the harboring half, which bars a landlord from knowingly or with reckless disregard harboring an illegal alien in an apartment. Now, before I proceed down the list of issues that you mentioned, Judge McKee, what I'd like to do is notify the Court of two recent opinions that came down after briefing, and then go straight down the issues as you described them. The first was the U.S. Supreme Court case of Washington State Grange v. Washington State Republican Party, which was handed down in March after the first brief was filed. And the second is the Ninth Circuit case of CPLC v. Napolitano, which just came down last month in September. First, Washington State Grange. In that case, the Supreme Court held it a 7-2 decision. I had a closing thought, so I had notice of this. Yes, both are covered in our reply brief and in a 28 January. Okay. In that case, in Washington State Grange, the Supreme Court handed down a decision reaffirming the Salerno standard from United States v. Salerno, which is the standard that controls all facial challenges. The Court said, quote, the plaintiff in a facial challenge must establish that no set of circumstances exists under which the act would be valid. Now, the district court below erred by not even mentioning the Salerno standard, much less applying it. But the time in Salerno, there was some issue about the viability of Salerno. Right. And appellees note this. They say in their response brief that the Salerno standard is in doubt. And that's why the Washington State Grange case is so critical, because they evidently didn't know that it came down right about the time they were writing their brief. But the Court came back in Washington State Grange and said in all facial challenges, the Salerno standard applies. And the Court said this, in determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about hypothetical or imaginary cases. End quote. That's 128, Supreme Court 1190. Now, the reason this is so important for this particular case is the district court's analysis of the due process question and most of its analysis of the preemption question. Everything except the express preemption part is based on hypothetical cases. Hypothetically, if an alien were applying for asylum. Hypothetically, if an alien were under temporary protected status. None of these are based on actual plaintiffs before the Court. That is a critical analysis. Let me ask this. Let's assume that understanding is challenging everyone's – I think you're challenging all the associational standing and the individual standing. Let's assume that we find that there is at least one plaintiff, be it an associational plaintiff or an individual plaintiff, with standing. And the question I'm asking, we don't know the answer to and didn't take the time to take a look at it. If someone has standing – let's assume you have an ordinances statute with ten different provisions and there's probably standing to challenge two provisions of the statute. So there's no Article III issue. If there's standing to challenge a provision of the statute, can the person with standing, thereby allowing us to exercise our Article III power, challenge the statute, the entire statute, the other provisions in the statute which may not go to the precise issue in which they're standing? The answer is no, Your Honor. And we did cite this in our first brief that the Supreme Court precedent establishes that you may have standing to spring specific challenges. For example, a landlord – may I get that for you in my rebuttal arguments? A landlord, for example, wouldn't have standing to say that a hypothetical claim discrimination – that was one of the claims rejected by the court below. But let's say that the Equal Protection Clause were still here. A landlord would not be able to say, I am being denied a tenancy because of my race or my ethnicity. But here there's more in terms of a landlord standing if a landlord has standing than just being denied a tenancy. And I agree, Your Honor. Each plaintiff, if they have standing, has a set of issues that they could have standing for. But none of them has standing to raise all of the issues. The second case I wanted to mention is CPLC v. Napolitano. And that stands for Chicanos por la Causa. That was handed down on September 19th in the Ninth Circuit. And that is the only other circuit that has addressed a case precisely like this one. That was an Arizona law which contains provisions identical to this law. There were some of the same drafters involved in drafting both laws. Here there's an issue about the I-9 form and the extent to which there may be a preemption here because the Hazleton Ordinance does not require an exemption or a safe harbor, if you will, for the employer relying upon the I-9 form. As I recall, the Arizona statute in the Chicano case did have that kind of provision. Although the Ninth Circuit didn't discuss it. Right. The court didn't discuss it. But basically the same template of challenges were brought by the plaintiffs in both cases. And the Ninth Circuit, you're right that there is a slight difference as to whether or not an I-9 form offers a safe harbor and whether the state, and we argue that Hazleton has no obligation under preemption theory to mirror a safe harbor. As long as the ordinance is within the concurrent enforcement, and I'll get into that doctrine, it does not penalize any conduct that is not penalized under federal law. But the Arizona law issue actually went farther than the Hazleton Ordinance. The Arizona law issue not only imposed the same penalties of a loss of business permit for an employer who knowingly hires unauthorized aliens, it also required every business in the state, and this was very much in the news recently, every business in the state to use the E-Verify system. And that's something that appellees complain about, saying that it might be conflict preempted. The Arizona statute went further, said every business has to use it, whereas the Hazleton Ordinance only says you get a safe harbor if you use it, and it's encouraged. The CPLC case, the Ninth Circuit, held unanimously that federal law not only allows UT mandate E-Verify or encourage E-Verify, but that it is consistent with the intent of Congress to maximize the use of E-Verify. And that is found at page 13077 through 78 in the CPLC opinion. What does Arizona provide that every business has to use what? The E-Verify system, which is not mandated by Hazleton. It merely gives a business in Hazleton safe harbor, and so they're encouraged to use it in Hazleton but not mandated. There's also a circumstance if a business is a repeat offender in Hazleton, then they could be mandated, which, by the way, is exactly what the federal government does. This is on the employment part. This is on the employment half. Yes, this is on the employment half of the Hazleton Ordinance. So another aspect of the CPLC opinion, which, again, goes through all of the preemption arguments and all of the due process arguments on the employment side of this case, another aspect of it that's very important has to do with the guiding Supreme Court precedent of Dekanis v. Bika. That was the last time the Supreme Court spoke about immigration preemption in 1976. Now what the district judge in our case did, in this case did, the district judge set aside the holding of Dekanis that there is no field preemption, field being one of the two categories of implied preemption. And the district judge said, we don't think Dekanis is good law anymore. It's 32 years old, and IRCA, the Immigration Reform Control Act of Congress, was passed in 1986. We think that now occupies the field, and so therefore we are not going to hold ourselves to the Supreme Court precedent of Dekanis v. Bika. The Ninth Circuit performed the same analysis and rejected that holding. And the Ninth Circuit furthermore said, we believe that the continuing vitality of Dekanis is clear, and that's on that 13074 of CPLC. And that's very important because one could argue that a district court or any inferior Article III court should wait for the U.S. Supreme Court to decide when a holding of the U.S. Supreme Court is no longer good law. But again, the CPLC … In fact, it's the case. The Supreme Court has told us that until they decide that it's been overruled, it's still a law. Correct, Your Honor. And while we're on the topic of Dekanis, I do want to mention one thing about that. Dekanis sets the standard for all cases involving implied preemption claims concerning immigration. Under Dekanis, there are only three ways that implied preemption can occur. If the state or local ordinance is a regulation of immigration, which is defined very narrowly to mean a regulation of who can come into the country and who can't, and no one alleges that this is what Hazleton is trying to do. And the conditions under which they can remain. And the conditions under which a legal entrance can remain. And Hazleton does not define conditions under which legal entrance can remain, only illegal. Secondly, if Congress expressed the manifest purpose of fully occupying the field and ousting the states from the field. And thirdly, if there is a conflict with the full purposes and objectives, the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress. And that's page 363 of Dekanis. Now, the Dekanis court left us a clue about field preemption, though. It said, field preemption will not occur unless there is a complete ouster. The exact words from Dekanis at page 357 is, only a demonstration that a complete ouster of state power was the clear and manifest purpose of Congress would justify that conclusion, end quote. The district court ignored the words complete ouster. I know you want to finish your field preemption analysis. In surprise, I can apply Dekanis to this case. And I agree with you. I think it does. And we haven't conferenced this office. So whatever I say, it's me. It doesn't indicate anything about the holding of this panel yet or the court acting to this panel. But Dekanis did seem to indicate the extent to which something which facially impacts immigration is a regulation of immigration. And that could be very helpful for the purposes of this panel. Well, with respect to your Honor, Dekanis actually said that a law affecting immigration is not a regulation. That's exactly what I'm saying. Oh, I'm sorry. I didn't hear the nine. So here we have an express preemption provision. Right. And it's going to get into an issue about whether or not this is a licensing or similar law or something beyond that. And I think, and maybe you wouldn't agree, but if it is something beyond the licensing provision, wouldn't the specific preemption provision in IRCA, the federal statute, then state that this is a preemption? Actually, your Honor, it's a little bit broader than that. The way the IRCA provision is phrased, it says sanctions, civil or criminal sanctions, other than licensing or similar laws. So local laws that do not impose sanctions would not be preempted. Only sanctions that are not within the predicate. So, for example, a local law that says you can't withhold this kind of salaries paid to an illegal worker from your local income tax. That would not be a sanction. That would just be another kind of law or a law mandating you verify, for example. Well, I'm not sure about the first example, whether or not that would be a sanction. Sure. But we could speculate about various hypotheticals. The point is only if it's a sanction is it preempted, but it's not preempted if it's a licensing law. Now, the CPLC court, the Ninth Circuit, went through this analysis with exacting precision and said clearly this is a licensing law. It's denying when a person can have a license. And the argument that was made by the plaintiffs in CPLC is identical to the arguments by the plaintiffs here. And they said, well, there's a House Committee report, one of four Committee reports, only one, mentioned this provision. And in that House Committee report, there is a suggestion, if you squint your eyes and you read it just the right way, you could read it as saying that that means you only can impose this licensing sanction after a federal judgment has occurred. Well, that wouldn't make sense because the only actor named in either the Committee report or in the statute is a state and local entity. There's no discussion of any federal actor doing anything before a state may be triggered, before the action of the state or the opportunity of the state can be triggered. The CPLC court rejected the exact same argument that they are advancing here. So I think it's clear that Dukakis applies unless there's a complete ouster, and the Ninth Circuit came to that same conclusion. But before I go to standing, I guess we're kind of doing this in reverse order. While we're on the subject of preemption, let me talk a little bit about conflict preemption and then close this first part with standing. Now, with respect to conflict preemption, I will let the CPLC decision speak for itself, and I think it adequately addresses the employment half of the ordinance. But what about the harboring half of the ordinance? Now, since there is no express preemption claim and there is no field preemption claim against harboring, they have to say that there's a conflict with federal law. Now, what the district court failed to do is apply the correct standard for conflict preemption. The Dukakis court said you must show that Congress unmistakably ordained that statutes of this type cannot occur, unmistakably so ordained. And then in Torr v. Moreno, 458 U.S. 1, the Supreme Court came back and said, you have to show strong evidence that Congress intended to preempt. You can't hypothetically dream up situations. You have to show Congress intended to preempt this kind of thing. And that they have not done. The plaintiff has not presented the evidence and the district court has not shown it. Instead, what the district court did is the district court invented its own congressional objective, not based on any congressional statute, and that was a congressional objective of avoiding excessive enforcement. This is found at page 527. Wait a second. I think you'd agree that under the congressional scheme, you can have someone who is here illegally, but yet is not necessarily in a situation where they have no rights to remain, no legal rights to remain. The district court hypothesized that they might. And these, again, violate the Salerno standard, but you're right. The district court hypothesized, well, let's imagine cases where someone is here legally, but still illegally, but still has the right to remain, and thought about a person seeking asylum who has a pending application. A person is granted withholding of removal. There are several problems. One is that they violate the Salerno standard. No such person has been presented. It's a facial challenge. You can't even discuss those. But suppose that we did have plaintiffs of that nature in the case. The other problem is all of those categories are actually categories of aliens whose presence is now lawful. Federal law stipulates in each of those cases where your status changes from unlawful to lawful. And so the city of Hazleton does not make its own judgment. Even though, and it may be that Salerno will foreclose this inquiry, even if you say someone comes in from Afghanistan on a visa's visit and they're fleeing the Taliban there, they get a visa's visit to come, a visitor's visa to come, and they're allowed to be here for six months, they stay for seven or eight months. But they would have a clear asylum claim if it were to be raised. Under your scenario, and I understand this is a really important thing, Salerno, but in terms of the principle of health, under your scenario, they would have no right to remain. But it seems that under the federal immigration law, they're not necessarily foreclosed of the opportunity to present the argument that they have a right to remain in an asylum or withholding of removal or recant application. And if they have the opportunity to present that, I guess my inquiry, my problem is where do they live while they're waiting to make that presentment or after they file the asylum petition? Where do they obtain shelter? Where do they live? Two responses, Your Honor. First of all, a person in that scenario, actually the status is legal while they're here on their B visa for a temporary visit, let's say. Their status becomes illegal if then they let the visa expire. They're here for six months and seventh month. And then at some point, their status comes back to legal if they are granted asylum. Now, other circuits have actually. Once they're granted asylum, there's no issue. Well, other courts have addressed exactly this issue. Most specifically, the Tenth Circuit in the Atandi case. And the Tenth Circuit says that the person is unlawfully present until the federal government grants the asylum claim. Also, U.S. versus Lucio in the Fifth Circuit, same conclusion. And so there is no such thing as what the appellees suggest of people whose status is both lawful and unlawful at the same time. Every other circuit has recognized that you've passed, you've hit a point, and then your status may change. Would there be any point at which either by preemption or by the concept of liberty embodied in the due process clause, whatever hand they put on it, would there ever be a point beyond which a township could not inflict a burden upon the person's presence? Rental is one we have in this case. What about applying food? Could Hazleton, buying food, could Hazleton enact an ordinance that says that? In order to purchase food, you have to prove anybody in the township. Before you can purchase food from a grocer and before the grocer can sell food, there has to be demonstration of proof of eligibility to be present. Well, Your Honor, that raises an interesting question because that would be a contract sale of something to someone who's unlawfully present. Now, that would raise a big question because you'd be – At least it's the same thing. I think in that situation, this would be more of a 14th Amendment claim because then the plaintiffs would say, well, all citizens need to eat, all aliens need to eat, and you're imposing a hurdle before we're allowed to purchase the food, and that hurdle probably doesn't meet the compelling public interest standard, and you would go to strict scrutiny, I think, in a case like that. What about the right to shelter? Well, here they're not actually denied the right to shelter. They're denied the right to rental accommodations, but they can certainly purchase accommodations. They can stay at a hotel. They can stay with friends. There are all kinds of ways that they can obtain shelter, or they can stay outside the city limits of Hazleton, of course, but there are all kinds of ways they can obtain shelter, and the district court never even suggested that they would have a fundamental – that this would be a 14th Amendment fundamental rights claim burdening their right to shelter. I'm just wondering how far you'd take this kind of an ordinance because on the household thing, they'd easily say that no person can purchase property unless they can show the same kinds of things that someone has. It raises an interesting question, Your Honor, and I think my answer would be that at some point, with some of these hypothetical denials of things, you'd be talking about fundamental rights, and that would trigger a 14th Amendment claim. The other thing we have to remember, though, is that federal law on Title VIII, Section 1621, denies public – requires every state to deny public benefits. Every state and every city deny public benefits to aliens, and it gives this long list of what constitutes a public benefit. So right now, a lot of things, including housing assistance and food assistance – Housing assistance, but not housing. Correct. Are required to be denied to illegal aliens. Now, you wanted me to get to standing, and I know there's only a minute left of my first point, so let me just quickly address the standing issues. We don't even need to get to any of these complicated questions because the plaintiffs have not shown that they have a specific individual who has standing. Now, the main problem is a constitutional standing. They haven't met prong two of the Lujan test, which is that you must show that there is direct traceability from the government action to the injury suffered. With all of the plaintiffs, the reason they fail prong two is because they fail what the Supreme Court has said in Lujan and its predecessor cases. You cannot have the intervening actions of a third party not before the court. In other words, if a landlord says, I'm not going to be able to rent as many accommodations in the future, the landlord is speculating that someday an illegal alien will come and rent to him. None of the landlords say they're currently renting to illegal aliens. Someday someone will come and rent from him, and then he's speculating that another third party will show up, and that's a resident of Hazleton who will complain and trigger the enforcement process. What about the burden on not just aliens, but every citizen of Hazleton of getting, and I assume that Lozano and Lechuga, John Doe 1, 3, 5, and 7 are all residents of Hazleton. I think the record supports that. The record supports that the named plaintiffs are residents of Hazleton. There are a lot that we don't know about the John Does, and indeed questioning was severely restricted during depositions. For example, John Doe number one, plaintiffs will allege that his status is uncertain. During depositions, he did volunteer that he thinks he already has a lawful permanent resident card from the federal government, and so it appears he's a green card holder, and he would not be injured in any way by this statute. But if they're not injured, everybody under this has to obtain a permit, a tenancy action permit, and that's what you call a residency permit. And so anybody who's over the age of 18, even if they're living at home, has to go down to the government office, prove who they are, they have a right to be there before they can rent an apartment. Actually, Your Honor, I would agree with that characterization except for the word prove. The tenancy registration ordinance on its terms, and as explained by the code enforcement officer, no permit will be denied to anyone. They merely have to provide information that they believe establishes who they are, and then the city will make a copy of that and keep a record of it if there's ever any future enforcement. So there are no denials. They simply have to pay their few dollars a fee, and then they will be issued the permit. Well, what is the fee, Your Honor? I believe it's $5, but I'll double-check that. How long does that permit last? For as long as the tenancy lasts. If they get a new tenancy, they need a new permit. The last thing I found about standing is that there were two prudential standing arguments. One brought up by Justice O'Connor, and she says that no illegal alien is within the zone of interest under the Immigration and Nationality Act. And that means that they would – and nor did she say is an employer or a landlord for an illegal alien within the zone of interest. But there's an issue when part of the challenge goes to preemption. There is an issue about whether or not the zone of interest test applies, isn't there? Well, Justice O'Connor thought that it did. And I would agree with you that normally you think, well, this isn't the kind of statute that creates a protected class. But her reasoning was that we are all – all U.S. citizens and lawful residents who are aliens are all protected by the INA. And so, therefore, illegal aliens and those who harbor or employ them are not within the zone of interest. It was an interesting case, and that was INS versus Legalization Assistance Project of L.A. County Federation of Labor. That's 510 U.S. – But the argument would suggest that illegal aliens don't have any due process protection. I know you're not saying that. No, not at all, not at all. It's merely that they wouldn't have standing to bring a challenge under the INA. They can challenge their own deportation and say, I don't meet that category under the INA. But they cannot bring a challenge seeking the shelter of the INA, which is essentially what's happening here. They're saying the INA preempts what Hazleton is doing. Thank you, Your Honor. Was there a question? Obviously, this is an important case. They're all important, but this has more public interest than most. If you want to put your argument very strongly, I'm not going to disabuse you of that. If you want to continue, and we've barely scratched the surface here. As long as I can have ten minutes for rebuttal, however you'd like to proceed, Your Honor. If you're done and want to save it for rebuttal, that's fine. Okay. You'll have more than ten minutes on rebuttal if you need it. Okay. Thank you, Your Honor. Thank you. Good afternoon, Your Honor. Please, the Court. Omar Jadwa for the Plaintiff's Appeals. I'm going to be addressing the preemption issues. My colleague, Mr. Volchak, will address the remaining issues. I think that's the same order that the other side went in. So the fundamental question on preemption in this case is whether every city in this country can enact and enforce its own immigration laws that conflict with federal law and that bypass the federal government's agencies and procedures for administering that federal law. That same issue puts the rabbit in the hat, because under the canons, this is not an immigration law. It's an enactment of an ordinance that has some tangential impact upon immigration, but it's not, as I read the canons entirely, this is not an immigration law. Well, I'd like to address both the housing and employment. I'm sorry. Yes, and I want to zero in on your use of the word conflict, and it would help me greatly if you would point out specifically where you find those conflicts between Hazleton and federal. Sure. On the employment side first, and this, I have to emphasize, was not an issue that was addressed in the Ninth Circuit case that my opponent cited to you. There is no discussion of conflict preemption in that case. It rests entirely on express preemption. And in addition, as Judge McKee noted, that law is different in its particulars from the Hazleton law that we're now addressing. So the specific conflicts that we have identified are that the Hazleton law bypasses IRCA's very elaborate procedures for establishing whether a violation is taking place and bypasses the agencies that Congress set up to administer IRCA, the Immigration Reform and Control Act. It takes away employers' repose if they follow the I-9 rules from liability. How does it do that? Because under the federal laws, if you follow the I-9 rules and determine that somebody's documents are facially valid, reasonably appear to be valid, then you have an affirmative defense to liability under the federal law. Well, they say that what they're doing is even better than an affirmative defense because they kind of nip it in the bud. You can't do anything under the ordinance in Hazleton. It's not just an affirmative. I'm not sure I buy that, but they're saying that it's more protection than an affirmative defense would be. I don't think their argument is that if you've facially complied with the I-9 procedures, you're not liable under the Hazleton law. Regardless of what you've done under I-9. Well, if a complaint is filed with the code enforcement officer, it's the employment provisions. If a complaint is filed saying an employer is hiring somebody or referring somebody or whatever who is not legally here, that complaint, as I understand it, is made known to the employer, and then the employer then can check and verify that person's eligibility to hire, and then the complaint – I don't know what happens to the complaint. I'll ask Mr. Corbett about that. From what I understand it, he is saying that it's more than an affirmative defense. Again, the fact that you have complied with the I-9 procedure in Hazleton means nothing in terms of your liability under the Hazleton law. What they've said is that maybe the employer can avoid ultimately having their license suspended if they fire the person on their own before the code enforcement office comes after them. But that's not anything like the procedure that exists in federal law. And, in fact, both the employer and the employee, in that case, will have suffered as a result of the application of the Hazleton law. The employer just has to show a proof of identification, doesn't he, to the city? I'm sorry? He just has to show that he had some identification from the worker, and that would be – if he did an I-9, it would be something like a passport, right? The employer – what the city requires the employer to do when it gets a request or a complaint about the employer is to produce some sort of identity information. But that doesn't – producing that information doesn't get the employer off. It doesn't end the inquiry. That's only the beginning of the enforcement process. And my colleague can talk a little bit more about the details of how that procedure operates. Well, if he had the valid requirements under the I-9, it would be a good identification, right, unless it was forged. Yes, but the city then takes that identification and starts the enforcement procedure, checks to see whether the person's – you know, checks with the federal government. If they get a negative response from the federal government, then they tell you, the employer, that you have to fire that person. That, again, is not the procedure that Congress set up in IRCA and doesn't give employers the repose that they're entitled to rely on under IRCA. And I'll point this court to this court's decision in Rogers v. Larson, which was a year after Dukakis v. Bika, which involved Virgin Island immigrant employment statute. And what this court did in Rogers v. Larson was it noted that the Virgin Island statute took away the reliance that the employer could have on the way that federal law operated. So under federal law, you could hire a temporary worker and be sure that you could keep that worker as long as the temporary status continued. The Virgin Islands law put a different twist on things and struck that balance between protecting workers and allowing for temporary workers differently. And this court found it conflict preempted a year after Dukakis. And the reason that this court could do that and the reason that this court can reach conflict preemption without interfering with Dukakis in any way is that Dukakis didn't address conflict preemption. Dukakis is a case about constitutional preemption, the issue of regulation of immigration, and field preemption. And what does IRCA do to that argument? This is the relevance of Rogers v. Dukakis. What is IRCA, which came after Dukakis and after Rogers? What does that do to the argument you're making? Does it impact it at all? Sure, but the conflict that we're identifying here is a conflict based on IRCA, based on the difference between IRCA and the Hazelton law. And so that's the sense in which IRCA is relevant. But Rogers tells us basically where the limits of Dukakis are and shows us that, as Dukakis itself does, that it doesn't speak to conflict preemption, as, again, the Ninth Circuit case didn't speak to conflict preemption. Well, then what do we do with 1324A of 8 U.S.C., the one that carves out and specifically seems to go to this issue of preemption that we touched on earlier? Does the provision of this section preempt any state or local law, including civil or criminal sanctions, other than through licensing and civil laws, upon those who employ or recruit or refer for a fee for employment? And, again, this is an express preemption issue. This is about the reach of the express preemption statute. But the fact that we have an express, and I think it would be the case to say the fact that there's an express provision of preemption within a statute does not necessarily negate the other areas of implied preemption. Exactly, exactly. So the fact that there's an express preemption provision with a savings clause has to be analyzed to see whether there's express preemptive effect in Congress's law. But this Court has to separately look at the issue, applying ordinary conflict preemption principles, about whether there's a conflict between federal law and Hazelton's law. Well, to your mind, does 1324A apply equally in this case to all of the issues before it? We've got business licensing, we've got landlord-tenant issues, and we've got this third-party employee cause of action that can be brought. Right. I think the express preemption provision clearly preempts the private cause of action created under the Hazelton statute. It also expressly preempts the employer sanction scheme that Hazelton tries to set up. But I think the other issue of housing is separately conflict preemptive, is not addressed, is not encompassed within 1324A-H2. You're saying that the employee sanction that's set forth in Hazelton, that is not a licensing provision? Is the employer – I'm sorry. From what you just said a few minutes ago, I assume that you're arguing that the restrictions on employing somebody and what happens with the business license, the discussion we've just had, you can't authorize or authenticate the person's legal ability to be here, legal status to be here. You're saying that is not a licensing provision? That's right. Why isn't it? Well, I'd like to start by noting that in Locke and in this court's decision in Barber, the courts have recognized that savings clauses and express preemption provisions can't be read so broadly as to destroy the preemptive effect that Congress is trying to achieve. And I want to point out that – That helps you a lot with regard to the landlord-tenant issue. It seems to me private employees, third-party cause of action, cause of action against the employer. But how does it help you here where the business license seems to fit squarely within 1324A-H? Well, I think for one thing we need to look at what Hazleton is saying here. Hazleton has said that their interpretation is that any law that makes it more difficult to do business in Hazleton is a licensing or similar law. That really would and does open the door to cities all over the country making their own rules and setting up their own procedures for deciding who can work based on their immigration status. But I would – The licensing law – The same things that make it more difficult for businesses to do business in Hazleton if they employ other clients also makes it more difficult for everybody to do business in Hazleton. So it's not part of our analysis, but it is kind of ironic. I mean, these provisions make it more difficult for anybody to rent an apartment. That's right. Under the business there or to hire somebody to rent your lease. But I would point out that the purpose and the structure of this Hazleton law is to be a law about alien employment that happens to include, among other sanctions, a licensing sanction. That doesn't make it a licensing law. If we look at the common sense understanding of what a licensing law is, and this is addressed at somewhat greater length in the Change to Win the Labor Amicus Brief, those are laws that set out a series of qualifications that one needs to have in order to engage in a business. And that's not what this law does. In addition, I think it's clear if we look at what Congress had in mind. We know what Congress had in mind when it wrote this parenthetical, the seven-word parenthetical in a broad preemptive provision. We know what they had in mind not only because of the legislative history, but because of the structure of IRCA itself. And that's one of the things that the courts have looked at when trying to interpret these provisions. The structure of IRCA is in the very section after establishing the employer sanction scheme, IRCA amended the Agricultural Worker Protection Act to modify the way that farm labor contractors were treated under federal law. And what Congress did was to basically require an IRCA finding before allowing any action to be taken against a farm labor contractor's license. And that's precisely what they were trying to do on the state level with that parenthetical, to allow for a genuine licensing scheme to – How would you define a genuine licensing scheme? What's it look like? Well, I think if you look at, for example, a liquor license or let's say a temporary worker provision license, right? So let's say it's a scheme that says in Hazleton if you want to provide temp workers, you've got to advise them of their legal rights. You've got to, you know, post your rates at the door. You've got to respond to – you've got to, you know, make sure they're qualified as X or Y workers. And you can't violate IRCA. And if you are found to violate IRCA, then we will revoke your license. That is the kind of law I think that's consistent with what Congress had in mind and that is consistent with the language of that paragraph. How is – and this is one thing that maybe you can help me out with. And only insofar as it pertains to employers, except for the I-9 provision, which is absent. And that may be a big exception. I don't know. But it comes out for a second. Except for that, how does this do anything that is not already accomplished by IRCA? It – I mean, it conflicts. We talked about several of the conflicts. There are additional conflicts.  How does it do something that is not already provided for by IRCA? So while, for example, it sets up this private right of action that provides for strict liability against employers. Take that out as well. Oh, take that out as well. Okay. Forget that. It requires employers to verify – it requires in practice employers to verify independent contractors and domestic workers who are excluded from the verification requirements under IRCA. It requires the use of the e-verify system where Congress gave employers a choice about whether to use e-verify. It penalizes employers without providing for the jury period and procedures that the e-verify laws and regulations provide. And it adds new sanctions without countervailing anti-discrimination provisions along the lines that the federal government did. So those are part of the law anyhow and they're implicitly included in this law because it's contained in the federal law. So the absence of it in local law doesn't mean anything. The absence does mean something because IRCA represents a careful balance between multiple congressional objectives. If someone engages in the conduct that is prohibited under federal law because they discriminate on the basis of IRCA and the prohibited conduct there, whether or not that's a violation of the Hazleton Ordinance, it's still illegal. It's an illegal employer action under federal law. You're saying this has to be as extensive and as limited as the federal legislation in the area in order for it to survive conflict prevention? No. What I'm – no, I'm not necessarily saying that. That's not what I'm saying because I think I've described an example of a licensing law, which I think could be added without causing conflict or express preemption problems. But what I am saying is that Congress, when it created IRCA, was trying to reduce unauthorized employment, but it was also trying to minimize the burden on businesses and on innocent workers. And it's clear, anyone who looks at the I-9 system will tell you they could have devised a more draconian way to make sure that people didn't work without authorization, but they didn't. And not only didn't they do that, they specifically set up an anti-discrimination scheme to balance those effects because they were very concerned that innocent workers would suffer and that businesses would suffer if they struck the balance in a different manner and strike it – and, you know, as the Supreme Court has said, it's not up to the states to choose an iron fist where Congress has chosen a velvet glove. It's not – that balance was important to Congress, and it's the reason that we have amicus briefs from many different aspects of society here, because – not because those groups all agree on what immigration policy should be, but because they all have a stake in the balance that Congress has struck. And if we allow states and cities one by one to strike their own balance around the country, we're going to have a balkanized and, frankly, meaningless immigration policy. In Congress – in Section 115 of IRCA, Congress said that the law should be administered uniformly, and that's what – that's going to be impossible if Hazleton and other cities are allowed to enact their own schemes. I want to talk for a moment – if Congress wants to stop the balkanization, as you call it, they could come out very expressly and not have any licensing exception or anything like that. I mean, it would be easy to pass. Well, nothing's easy to pass in Congress, especially when it comes to immigration, Your Honor. But I think that actually, you know, the statute is clear the way it is. It doesn't provide this kind of room for states and cities to come in and meddle. And we shouldn't require an additional express statement to – where there's a conflict. And that's exactly what we're talking about here. I want to go back to the express preemption in H-2, which preempts any state or local law imposing civil or criminal sanctions upon those who employ or recruit or refer for a fee employment. How does that speak to this housing and tenant law? It doesn't, Your Honor. You're not claiming on that one. What the Hazleton law does, which is a conflict, a separate conflict, a different kind of conflict with federal law, is that it would require people who the federal government allows to live anywhere in the United States to leave Hazleton. And there was some discussion about, you know, well, it's just a rental law. It doesn't bar every kind of housing. But what this court and the Supreme Court do when they've looked at these preemption provisions is to consider the actual practical effect of the law. So in Roe v. New Hampshire Motor Transport, which came down last year from the Supreme Court or earlier this year perhaps, the federal law there at issue regulated motor carriers, but the state law that was claimed preempted regulated people who were shipping items in commerce. And the Supreme Court said, well, that carrier law still preempts the shipping law because the effect of the shipping law is to make carriers' lives different, to change the rules that apply to carriers. And what Hazleton is trying to do here is to say that you can live anywhere in the United States except Hazleton, that we are going to go and, based on a snapshot of your current status, determine that you can't live here. And that's not the system that Congress set up. It bypasses all of the discretion that Congress left to the executive branch and to the agencies in how to administer the statute and how to provide for relief and prosecutorial discretion. It's simply inconsistent with the structure of our federal immigration law. Is there a problem in terms of who makes the determination here of legal presence? As I understand it, under one of the provisions, and I guess it's the general provision, that an appeal has to go to the TANC and take an appeal to the Magisterial District Court of Hazleton, I guess then to the Court of Common Pleas under Section 7F of the ordinance here. And maybe I should ask, and I will ask Mr. Korbach about this, but I'm trying to figure out to what extent this ordinance allows local officials to make determinations of alienage. I think it not only allows it, but it requires it. And the federal laws say that the federal procedures, where you have an immigration judge, I know you guys are very familiar with this, an immigration judge proceeding, judicial review in the courts of appeals or through other means, all of those provisions are specifically stated to be the sole and exclusive procedure for determining removability in this country. But, again, what Hazleton is trying to do is set up a separate city-level immigration enforcement agency that is not responsive to any of the rules, basically to most of the rules that Congress has set up, and that doesn't have the authority that Congress provided to the immigration apparatus to make those decisions. I just wanted to point out two of the key differences between the Arizona law and this law, which is that there's no housing provision at issue in Arizona. Yeah, you're trying to lead them. Yeah, yeah. So I want to try to focus you on to the extent that I can on the business aspects of this case, and that takes much of your time on the housing aspects or this cause of action Okay. I just wanted to point out that to the extent the Arizona law relies on Duqanis, it relies on Duqanis to support a presumption against preemption, the application of a presumption against preemption in its analysis. Now, first of all, the district courts found that we prevail regardless of whether the presumption is applied, and the Third Circuit has not hesitated, and this is in Colachico. It's noted in Colachico, and it's noted in some other cases as well, that this circuit has not hesitated even when it applies the presumption against preemption to find laws preempted where there's conflict. And so the ultimate kind of point of the Duqanis reference in Arizona is ultimately, I think, not determinative of this case, but I think it's also clear that we're not asking the court, and this court certainly need not overrule Duqanis in any sense. Well, we can't. Right, right. And that's why we wouldn't ask you to, right? Not that theirs is that much better than ours. But what this court does need to do is also give due credence to what Congress has done, because it's Congress that makes immigration policy in this country, and we can't ignore the fact that in 1986 Congress passed a law that the Supreme Court has since called a central feature of our immigration law, a law that creates a federal employer sanction system that has an express preemption provision in it, that has a detailed structure that Hazelton's law would interfere with. I guess as I listen to what you're arguing in your reliance upon Duqanis and the extent to which it hasn't been abrogated by IRCA is that, in Duqanis the court said that local regulations of an activity or an enterprise that has an impact or even a collateral or consequential impact on immigration is not, by virtue of that impact, a regulation of immigration. But, and then as I hear you arguing, you're saying when you have not something that has a collateral impact on immigration, but something that seems focused on regulation, a regulatory scheme that deals with living, that deals with working, how you can get an apartment. If somebody's fired, they can bring a cause of action against an employer, even though they were fired for every legitimate reason that may be, bring a cause of action for triple damages, no relation to the cause of action, because the employer, no matter how big the employer, has one undocumented worker there. That is beyond the Duqanis scenario, and that is an attempted parallel or collateral immigration scheme. That's really what you're arguing in terms of preemption. We have argued that. That is part of our argument, that the sum total amounts, if you look at what Hazleton's done here, it's trying to regulate immigration. We do make that argument, but ultimately I think this court did not reach that issue, the conflict on both the employment and the housing provisions. That may be an easier way to back into it than the way you wanted us to head into it, because if you start taking every single one, and then you match that up against the language that I gave you earlier in 1324A, and you get down to whether that's something that's a business license or not, it does seem to me that what they've done in terms of the employer part of it, it does look an awful lot like a licensing provision. And, again, even if you disagree with us on express preemption, the court still needs to address the conflict, and I think the conflicts are clear. And I think that to allow this law, again, is to allow the tens of thousands of municipalities in this country to create their own versions of the immigration law in every single municipality, and that can't be what the Supremacy Clause and what the Immigration Nationality Act allow. Thank you. Good afternoon. Vito Volchak for the American Civil Liberties Union in Pennsylvania on behalf of the plaintiffs. I'm not here to address preemption, but I thought I would just start out with just a couple of points I wanted to specify. I'm not sure if your voice is too soft or the microphone is too quiet. Oh, I'm sorry. Is that better? That is better. I just wanted to specifically address Judge Nygaard's question about conflicts, and I would simply direct the court's attention to page 53 of the appellee's brief where we actually list the seven conflicts in there. And, you know, one of the things that really struck me about a way to think about this was in – there's many wonderful amicus briefs filed in this case, but in Change to Win, which is the labor union's brief, the way they describe this is that this is not a licensing law. This is an immigration law that uses licensing as a sanction. And, you know, there's ways to regulate business. That's why I asked Mr. Zad what I did. It seems to me you are arguing, and maybe I didn't need to raise this carefully as I should have, but you are arguing that we have to look at the totality of what's happening here vis-à-vis the Dukakis argument anyhow to determine whether or not this is a licensing law, which under Dukakis and under the specific provision here would not be a problem, would not be a regulation of immigration, but the scheme may suggest that this is something more than – even though individual parts of it may impact licensing, the scheme may suggest something much greater than that. Well, I mean, I guess there's a question as if it really is a licensing law. Is it covered by that exemption in IRCA? Another way to look at it is this really isn't a licensing law, and Your Honor asked what would be a real licensing law, you know, regulated. What would it look like? And if you look at what's really going on here, whether the totality of circumstances or the specifics of the employer sanctions provisions, they are trying to effectuate what the mayor said up front and has said all along. We want to make Hazleton the toughest city in the country on undocumented immigrants. They want to get rid of all undocumented immigrants. That's the goal of this ordinance, and they simply have latched on to a license as a sanction so they can try to fit it in under this exemption. But this isn't your traditional licensing law. I'd like to – I wasn't going to talk about this, but there seems to be some confusion about how this ordinance works, and I think this plays into why there is such a conflict in terms of the process between what Hazleton is doing and what you have at the federal system. In Hazleton, right, you get a complaint, and the complaint can come from anywhere, and it can be either on the employment or the housing section. Hazleton then goes to the employer or the landlord and says, I need identity papers. Again, not defined. They then supposedly take those identity papers and they send them to the federal government. Now, let me digress here for a minute. There is no process set up right now as we sit here for that to happen, either legally or technologically. It's a facial challenge. It is a facial challenge, and I'll come back to that. Hazleton has amended this ordinance multiple times. We had a nine-day trial where they tried to walk away from some place. This is Hazleton's best shot. I joked with Mr. Kobach when I came in whether they were going to announce today that they've amended the ordinance yet again the way they did at trial on the first and last day, and that didn't happen. There was some discussion about that amongst particular judges in their courts. Right, but there is ‑‑ you know, at this point, Hazleton has had his best shot. We've had a nine-day trial, and when you're talking about Salerno issues, if you look at the cases that fall on Salerno, Salerno and Washington Grains say that don't say that facial challenges are disallowed. They simply say they are disfavored, and the reason, for instance, in Washington Grains or in the voter ID case, which is Crawford versus Marion, Illinois, the reason those cases went down and those challenges were rejected is because, in fact, there were facts at issue that had not been explored. I mean, you couldn't decide what burden, what standard you apply in the voter ID case because you didn't know what the burden was. In Washington State Grains, there was a question about how confused were voters going to get. Unless you knew what the ballot was going to be and what the elections board was going to do, you couldn't figure that out. In this case, you do not have any uncertainty about what the facts are going to be. We think the ordinance is clear, or the eighth or ninth reiteration of the ordinance, as we're looking at it now, is clear. To the extent there's even any doubt, we went through discovery, and we had a nine-day trial where all of that evidence was presented. So we have a very good idea of how this ordinance could work. But coming back to the procedures, assuming that there was a verification process that Hazleton could use, which I think under Salerno is an appropriate assumption to make, although as a factual and legal matter that system doesn't exist. But assuming that Hazleton could get identity documents electronically or some other way, send them to Washington, and then Washington comes back and says, yes, this person has work authorization or doesn't, or this person is authorized for benefits under SAVE system or not. What then happens is Hazleton goes to the employer, goes to the landlord, and says, you've got a problem. You're violating the ordinance, and you can cure this now by either getting rid of the employees or you're going to be sanctioned. And then if you don't like it, you can basically sue us in some after-the-fact tort process, which clearly is not enough. Under the federal system, if you go to, for enforcement of IRCA, for enforcement of an IRCA violation, there are a whole system of regulations. If you go to 28 CFR Part 68, you get full trial-type proceedings where you have a right to counsel, you have a right to cross-examine witnesses, you have a right to present evidence. None of that takes place in Hazleton. The Hazleton decision is simply made based on some database report, and that is a conflict, and as a matter of procedural due process, it's completely insufficient. They have a right to file suit, right? I'm sorry? I think you have a right to bring it to court. Presumably they have a right to file a 1983 action and come into federal court if there's a federal claim. They have a state remedy, too. A couple of points on that, Your Honor. I question whether it's truly a remedy if it's brought to a Pennsylvania district magistrate and the issue in there may be whether or not the tenant or the employee is authorized to be here in this country, and you're going to ask, say, that that district magistrate can make that determination. In Pennsylvania, Your Honor, district magistrates don't even have to be lawyers here. So query whether you could do that. But the more fundamental problem from a procedural due process perspective is that you have to have pre-deprivation process. I mean, that is the default. You can get around that for some kind of extraordinary situations, or if you have a Peratt versus Taylor type of situation where it's not clear, I mean, it's an unauthorized tort. You really couldn't have any kind of process. That's not the situation here. And as this court said in Alvin versus Suzuki in 2000, no matter how good the post-deprivation process may be, that doesn't cure your failure to provide pre-deprivation process. And, frankly, as there is no pre-deprivation process under this ordinance, even as it may have been explained and tweaked during the nine-day trial, I would point the court to page A1478, and this is Mayor Barletta's testimony, and I'm going to quote. Question. So the city of Hazleton does not provide a hearing to either the landlord or the tenant. Answer. Correct. End quote. And the two preceding pages is discussion about how this enforcement scheme for housing is identical to the enforcement scheme for employees. So the bottom line is there is no hearing. As to whether or not the person, in order to cure that, the landlord has to bring some action against the tenant, at which time there has not yet been a deprivation because the tenant is in there until the eviction process is actually effectuated. Right. But let's pull back here and look at the dynamics of how we even get to that point. So there's a complaint made about the tenant, and the tenant doesn't know any of this is going on because there's no requirement of notice. The best that Hazleton could do at trial is to say that, you know, we would attempt to give notice, and that clearly is insufficient when you're talking about deprivation of housing in there. I'm sorry, Ryan. The question was again? No, the question of due process is always what process is due, and if the tenant is going to get notice before the eviction because of the action to quit and premises of the eviction action, why wouldn't that be the kind of notice that would be in these circumstances adequate to enforce? I'm sorry. So then you get this complaint, and then this supposed verification system comes back and tells the landlord that this person is undocumented or we don't have any evidence that this person has lawful status. Hazleton then goes to the landlord and says, you've got to get rid of this guy because if you don't get rid of this guy, then there's draconian penalties, which is basically you can't be a landlord anymore. You can't rent to anybody, even if there's people here who are authorized. So then the landlord's process here supposedly is for the landlord to file eviction proceedings in, I guess, it's magistrate's court or in common pleas court. Well, it's magistrate's court, and then it goes to an appeal to common pleas. Right. But that is between the landlord and the tenant, right? And, you know, you have basically an at will kind of situation here with tenancy as you do with employment. If the landlord says, you know, I want to get rid of you for whatever reason, they can do that. The culprit in all of this is Hazleton, which is not part of those proceedings. So, you know, what really needs to happen is there needs to be a system set up whereby the landlord and the employer can contest in a hearing what Hazleton has now said you have to do, get rid of the employee or the employer. And that doesn't exist. And coming back to Judge Seiler's question, you know, can't you file a lawsuit, whether it's in district justice court or bring a Section 1983 action, or there may be other remedies after the fact. The two Supreme Court cases that I would direct the court to are Logan v. Zimmerman Brush Company and Zinnerman v. Birch. And in both of those cases, the Supreme Court said you've got to distinguish the process that's provided by the agency from sort of post-deprivation court and other judicial remedies that may be available, and those are simply inadequate. I want to come back now to maybe where Your Honor suggested we should start, which is with standing and Salerno. Let me start, and I guess we've talked a little bit about Salerno. I'm happy to answer other questions on that. I will note on Salerno that as I read their briefs and the arguments that they made, they did not raise a Salerno question on either preemption or Section 1981 or any of the other claims. Their Salerno argument seems to be limited to procedural due process, so I would argue the fact that they haven't raised that below that it's waived at this point. On standing, I think the problem with Hazleton's argument is that they confused the ultimate violation of the ordinance with whether or not there's injury in fact, and injury in fact is really just impact. You don't, I mean, you know, I think there's sufficient evidence in the record to support Judge Munley's conclusion that, in fact, these people were economically harmed. The landlords had trouble renting. But his concern was, or there is a concern from their perspective, that the record reflects that the trouble for renting was before and since there's an injunction restraining enforcement of the ordinance now, that it can't be, any loss in income can't be, I'm not sure I accept that, but any loss can't be because of this ordinance. Right, but again, I think that the problem, there's two problems with that. One is they're confusing injury in fact with a violation of the law, a violation of the Constitution and proving that. And as the Supreme Court said in Lujan, you know, you should not elevate the standing threshold to something greater than showing that there's a violation of the ordinance. I mean, what we're looking for here, is there some impact? And aside from the economic harm, which I would suggest is supported, that that is a little bit speculated, I will admit, but under Penel, it says, you only have to show that there's a probability that the person's going to be harmed. But you don't need to get to the economic harm, because there is certain harm inflicted on all of the plaintiffs. Any landlord in the city could just say, well, I've had people come by and they won't rent from me and it's worse than it used to be. Well, I don't, Your Honor, that's not the record that we have in this case. It's almost the record. Well, it's, I mean, I would suggest that it's... He said he had some people came by and told him about the law and they didn't come by anymore. They didn't rent from him. But I think it's a little, well, he said it happened multiple times, and, in fact, both of the landlords said that that happens. Does three times make it more standing than twice? Well, again, I think, you know, that's a question of fact, and you're looking, the review is clear error, and I would suggest that Judge Munley amply supported that finding. But the court doesn't need to go there. The court doesn't need to find that there's economic harm, because if you are an employer, this ordinance requires you to check employees' documents. And look at the facts of this case. First of all, IRCA would not require either Mr. Lozano or Mr. Esquinal to check documents of the roofer that Mr. Lozano needs to hire to fix his roof, or the electrician or Joe the plumber that Mr. Esquinal testified. Don't do Joe the plumber. I said I got to get that in here somewhere. He's been there, done that. Don't do Joe the plumber. But as a, I mean, it is certain that this is going to happen, and anybody who owns any kind of housing can say that one thing that's certain beyond death and taxes is that things are going to break in your house and you've got to get them fixed. When they hire that individual, they have to check their paperwork to make sure they're not undocumented. There is nothing uncertain or speculative about that. Same with you've got both Mr. Lozano and Mr. Esquinal testifying that, in fact, they have vacancies. They are trying to fill their apartments. Any tenant that comes in, they have to check for papers. There is no uncertainty or speculation about that. Under the registration ordinance, tenants need to register, and it's a $10 fee. That is certain. And landlords have to register, and I believe there's a $5 fee. So, you know, as I think Judge Nygaard knows from the first Pitt News case, I mean, the determination about whether there is standing is separate from whether or not there's a violation of due process or a violation of preemption. All you have to show is that there is some impact, some injury, in fact, on these individuals, not that, in fact, their rights have been violated. And we've amply done that in this case, and beyond that, there is a clear error standard of review. What do we do with the severability clause? There's a severability provision in the ordinance. There's a statement in the brief, and I'll ask Mr. Korbach about this, that argues that the one section, the probable cause of action section, is a, quote, necessary component of the ordinance, which suggests that the way the township is interpreting it, it's not really severable. That's why you asked earlier about an entire scheme. There seems to be a statutory scheme we have to look at rather than other provisions. What do we do from your perspective? It's an obvious question, but from your perspective, what does the severability clause mean, given the statement in the brief? Well, I think given the fact that Hazelton has, in fact, admitted that that separate private cause of action is so important to the scheme, I cannot imagine how the court could find that constitutional. But if that goes down, then I think the entire, at least employment section, and maybe to be fair to Hazelton, since that provision is not related to the harboring or housing section of it, if you find that as unconstitutional, it only knocks out the employment side of the ordinance. But we think there's other good grounds for knocking out the housing section. But if I could just take a couple of minutes, because this is a very, very important case, as the court has recognized. And while the court's focus is properly on Hazelton and the ordinance, this is truly a national case. And I think it is important to look at this case both from that national and a historical context, which is what the Supreme Court has instructed needs to happen when you have these preemption cases. And there are two significant consequences that will result if this court reverses. And the first I'm going to call the patchwork problem. Hazelton was the first city in the country to pass one of these ordinances. But it was by no means the last. And even though it may be a model, all of these laws are a little bit different. They may have a similar goal, but they operate in different ways. So Hazelton is different from West Hazel Township, which is right next door, which is different from Scranton that has nothing. It's different from Arizona. It's different from Escondido, California. Was there anything in the record about how many, at least at the time of the trial, how many townships have ordinances like this? I don't know if it's in the record, but I would direct the court's attention to the brief submitted by the U.S. Chamber of Commerce, where they do go through the ordinances in there, and they talk in some specifics about how at least the ordinances and statutes and the cases that are in court, which I think the court can take judicial notice of, how they're different. There's different verification systems. There's different enforcement schemes. So all of these are different in some way. And there's a reason, I would think, that you get both the U.S. Chamber of Commerce and major labor unions change to win, filing amicus briefs in this case on the same side. And the reason is that if this court reverses, it's going to send a green light to municipalities all across the country, and you are going to have a hopelessly fractured system of laws dealing with both employment and with housing. The second consequence of this court reversing is a word that Mr. Jagwatt used initially, and I'm going to call that balkanization. There are two excellent, well, they're all excellent amicus briefs, but two of them that particularly ---- Well, none of them are on your side. Well, I think our side are a little bit stronger, Your Honor. In fact, a lot stronger. They're even more excellent than yours. Thank you for that opening. But I would direct the court's attention to the briefs submitted by the interfaith groups and by the civil rights organizations, and basically they say those who forget history are doomed to repeat it. We have had many eras in this country where we've had large numbers of immigrants coming in. How is that right? We have these strange things called opinions in the discourse that somehow be tethered to legal precedent, and I've been known to quote Shakespeare in things, not in lead opinions, majority opinions, but how would that right where we take as a basic tenet of the opinion that those who forget history are bound to repeat it? Well, Your Honor, I think it's looking at the reality of what's going on here, and throughout history when you've had large migrations coming in, there has been a backlash, there has been nativism, and what's going on in this case, I mean, look at these ordinances. They were passed, and this is all in the record, they were passed with no study, with no supporting data. The mayor said we don't need data, we know what's going on here. Is that on the record? That is absolutely on the record.